1   GEORGE A. RILEY (S.B. 118304) griley@omm.com
    SHARON M. BUNZEL (S.B. 181609) sbunzel@omm.com
2   AARON M. ROFKAHR (S.B. 227008) arofkahr@omm.com
    JEAN B. NIEHAUS (S.B. 254891) jniehaus@omm.com
3   O'MELVENY & MYERS LLP
    Two Embarcadero Center, 28th Floor
4   San Francisco, CA  94111
    Telephone:    (415) 984-8700
5   Facsimile:    (415) 984-8701

6   Attorneys for Plaintiff
    Apple Inc.
7

**FILED**

AUG 1 3 2010

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

ADR

E-filing

8                 UNITED STATES DISTRICT COURT FOR THE

9                 NORTHERN DISTRICT OF CALIFORNIA

10                        SAN JOSE DIVISION

11

12   Apple Inc., a California corporation,          Case No. **CV10-03563 PVT**

13                       Plaintiff,                 **COMPLAINT FOR:**

14           v.                                     **(1)    VIOLATION OF RICO, 18 U.S.C. §
                                                            1962(c)**
15   Paul S. Devine, an individual; CPK            **(2)    VIOLATIONS OF THE ROBINSON-
     Engineering, Inc., a California corporation;          PATMAN ACT, 15 U.S.C. § 13(c)**
16   and Does 1-25, inclusive,                      **(3)    FRAUD**
                                                    **(4)    BREACH OF CONTRACT**
17                       Defendants.                **(5)    BREACH OF FIDUCIARY DUTY**
                                                    **(6)    MISAPPROPRIATION OF TRADE
18                                                          SECRETS**
                                                    **(7)    COMMON LAW MISAPPROPRIATION**
19                                                  **(8)    RESTITUTION AND UNJUST
                                                            ENRICHMENT**
20                                                  **(9)    CONVERSION**
                                                    **(10)   CALIFORNIA B&P CODE §§ 17200 ET
21                                                         SEQ.**
                                                    **(11)   MONEY HAD AND RECEIVED**
22                                                  **(12)   AN ACCOUNTING;**

23

24                                                  **DEMAND FOR JURY TRIAL**

25

26

27

28

For its Complaint, Plaintiff Apple Inc. ("Apple") alleges as set forth below. The factual allegations set forth below have evidentiary support or, to the extent they are contained in a paragraph made on information and belief, likely will have evidentiary support after a reasonable opportunity for further investigation and discovery.

## INTRODUCTION

1.     Defendant Paul S. Devine, a Global Supply Manager in Apple's iPod and Accessories Procurement Operations Department, has abused his position, violated Apple policies, and broken the law by stealing Apple's proprietary, trade secret and other confidential information and converting it to his own benefit. Over a period of years, Devine has demanded and received over a million dollars in illicit payments, kickbacks, bribes, and other things of value from companies supplying mechanical parts for Apple's products. In exchange, Devine has provided these companies with Apple's proprietary, trade secret and other confidential information to help them secure lucrative supply agreements with Apple or otherwise benefit their business interests. As part of this scheme, Devine has entered into covert side agreements with suppliers, opened overseas and domestic bank accounts, and, in an effort to avoid detection, insisted on cash transfers in low amounts and conducted surreptitious e-mail exchanges using coded language. Through these unlawful arrangements Devine has personally profited at Apple's expense.

2.     Apple undertakes rigorous and extensive measures to safeguard information about its product development, forecasts, pricing and specifications. Interactions between Apple employees and Apple's suppliers are governed by strict policies and agreements to ensure that the contracting process is perceived to be, and is in fact, equitable and fair, thereby serving the best interests of Apple and its customers. Devine's actions, which were concealed from Apple for several years, undermined Apple's procurement process, misappropriated and disclosed Apple's proprietary, trade secret and confidential information, and caused harm to Apple's economic interests.

3.     Apple brings this action to seek the full measure of damages and other remedies permitted by law.

**PARTIES**

4.     Apple is a corporation organized and existing under the laws of the State of California.  Apple's headquarters and principal place of business are located at 1 Infinite Loop, Cupertino, California.  Apple is engaged in the business of designing, developing, manufacturing, and selling a broad range of innovative products, including, among other things, personal computers, computer-related hardware, mobile communication devices, portable digital music and video players, software, and peripherals.

5.     Apple is informed and believes, and on that basis alleges, that Defendant Paul S. Devine ("Devine") is a resident of Sunnyvale, California.  At all times relevant to this Complaint, Devine was an employee of Apple in its Operations Department.  Devine was responsible for selecting suppliers and apportioning opportunities to supply mechanical parts for Apple's products.  Because Apple typically used multiple suppliers for each commodity, Devine was responsible for allocating Apple's demand for a particular commodity across multiple suppliers.

6.     Apple is informed and believes, and on that basis alleges, that at all relevant times herein Defendant CPK Engineering, Inc. ("CPK Engineering") was a California corporation, sole proprietorship or other business entity, doing business in the State of California.  At various times relevant herein, Defendant CPK Engineering may also have been known as and/or done business as "CPK Engineering."  Defendant CPK Engineering has succeeded to the obligations and liabilities of any and all of its predecessor entities.  Defendant Devine is the agent for service of process for Defendant CPK Engineering.  At all times relevant herein, Defendant CPK Engineering was an independent business entity with legal status separate from that of its individual owner(s).

7.     Apple does not know the true names or capacities, whether individual, associate, corporate, or otherwise, of the Defendants sued herein as Does 1-25, inclusive, and Apple therefore sues said Defendants by such fictitious names.  Apple will amend this Complaint to state the true names and capacities of these Defendants once they have been discovered.  Apple is informed and believes, and on that basis alleges, that each Defendant sued herein by a

2

1  fictitious name is in some way liable and responsible to Apple on the facts alleged herein for

2  Apple's damages.

### JURISDICTION AND VENUE

4       8.    This Court has subject matter jurisdiction over the claims alleged in this

5  Complaint pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §

6  1961, *et seq.*, and the Robinson-Patman Act, 15 U.S.C. § 13, *et seq.* This Court has jurisdiction

7  of this action under 28 U.S.C. § 1331 and has supplemental jurisdiction over Apple's related

8  claims for relief under California law pursuant to 28 U.S.C. § 1367(a). This Court has the power

9  to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

10      9.    Venue is proper in the Northern District of California under 28 U.S.C. §

11  1391(b)(1)-(2) and § 1391(c), 18 U.S.C. § 1965(a), and 15 U.S.C. § 15(a).

### INTRADISTRICT ASSIGNMENT

13      10.    Assignment to the San Jose Division is proper pursuant to Civil Local Rule 3-

14  2(c) and (e) because a substantial part of the events or omissions that give rise to Apple's claims

15  occurred in Santa Clara County, California. Apple's corporate headquarters are located in Santa

16  Clara County, California, and Defendants' wrongful actions were specifically and purposefully

17  directed at and intended to affect Apple in Santa Clara County, California, as discussed herein.

### DEVINE'S EMPLOYMENT AT APPLE

19      11.    At all times relevant to this Complaint, Devine was an employee in Apple's iPod

20  and Accessories Procurement Operations Department. Apple's Operations personnel, who are

21  the key communication link between Apple and its suppliers, play a critical role in ensuring that

22  Apple is a model of business ethics and professional integrity. Apple relies on its Operations

23  personnel's expertise, skill, judgment and loyalty to purchase mechanical parts as Apple's

24  representative from numerous competing suppliers at the most advantageous price and delivery

25  terms for Apple.

26      12.    On or about July 18, 2005, Devine began working at Apple as a Global Supply

27  Manager in Apple's iPod and Accessories Procurement Operations Department.

28      13.    As a Global Supply Manager, Devine was responsible for developing and

3

1    managing relationships with various companies that supply Apple with parts and materials for

2    Apple iPod and headset enclosures, and for selecting the suppliers that would be awarded

3    business to supply Apple with these parts and materials.  Apple typically selected more than one

4    supplier to supply Apple with a particular part or material.  Thus, in selecting suppliers, Devine

5    also determined how Apple's supply business would be allocated among competing suppliers.

6    Factors that Apple's Supply Managers should consider when selecting and apportioning

7    business among suppliers include the suppliers' capabilities, historical quality and cost

8    performance, and manufacturing capacity.

9        14.    As a Global Supply Manager, Devine had access to confidential information

10   regarding Apple's new products, including, but not limited to, product volume forecasts, product

11   component forecasts, product pricing, product specifications, and confidential component,

12   design and pricing information from Apple's suppliers (collectively, Apple's "Confidential

13   Information").  Apple's Confidential Information as described herein is of a confidential,

14   proprietary and secret nature and/or constitutes Apple's trade secrets.

15       15.    Apple paid Devine over $614,000 in salary and $51,076 in bonus compensation,

16   and issued 4,500 Apple stock options and 900 shares of Apple restricted stock to Devine over

17   the course of approximately five years, in exchange for his loyal services as an employee.

18   Devine also received a relocation package from Apple.

19       16.    In April 2010, Apple undertook an investigation into suspected violations of

20   Apple's policies by Devine.  In the course of that investigation, Apple discovered an Entourage

21   database and cache of e-mails from Devine's personal Hotmail and Gmail e-mail accounts

22   stored on Devine's Apple-supplied laptop hard drive.  These e-mails contained discussions with

23   third parties regarding Apple's Confidential Information in violation of Apple's policies.  These

24   e-mails also confirmed that Devine had demanded and received over a million dollars in illicit

25   payments, kickbacks, bribes, and other things of value (which Devine sometimes refers to in e-

26   mail correspondence as "samples") from numerous suppliers, and had concealed his scheme

27   from Apple over the course of several years.

28       17.    The causes of action alleged herein did not accrue until Apple discovered these

4

1    Hotmail and Gmail e-mail accounts on the imaged copy of Devine's laptop hard drive. Apple

2    did not discover and could not have discovered through the exercise of reasonable diligence the

3    factual basis of the causes of action alleged herein at any earlier point in time. Devine made

4    extensive efforts to conceal his unlawful acts. Devine obtained and used Hotmail and Gmail e-

5    mail accounts to conduct his fraudulent scheme, and warned suppliers who were making illicit

6    payments to him not to use his Apple e-mail address. For example, on September 16, 2008,

7    Devine e-mailed Andy Yang of Cresyn Co., Ltd., a company with which Devine had entered

8    into a covert side agreement to provide unlawfully Apple's Confidential Information in

9    exchange for illicit payments: "I received your email on my Apple email account. Please avoid

10   using that email as Apple IT team will randomly scan emails for suspicious email

11   communications for forecast, cost and new model information." Devine also repeatedly warned

12   suppliers that his illicit payoffs should be wired in amounts less than $10,000 to avoid detection,

13   apparently aware of bank reporting regulations that would trigger inquiries into the source of

14   funds where transfers exceeded this threshold amount. For example, on October 5, 2007,

15   Devine e-mailed Yang: "I still haven't received Sept payment. Can you check with your

16   Accounting Dept? Please do not send the Sept and Oct payment together in one wire transfer.

17   Anything over $10,000 wired could draw too much attention." Because Devine knowingly and

18   actively concealed from Apple the facts alleged in this Complaint, Apple only recently

19   discovered the information forming the basis of the causes of action alleged herein, without any

20   fault or lack of diligence on Apple's part.

21                        **DEVINE'S SCHEME TO DEFRAUD APPLE**

22          18.    From July 2005 through the filing of this Complaint, Devine, through his

23   employment at Apple, developed relationships with various companies that supply mechanical

24   parts for and/or assemble certain Apple products, and/or design or manufacture accessories for

25   Apple products. In furtherance of his illegal scheme, Devine targeted numerous suppliers and/or

26   other third parties, including at least the following: Cresyn Co., Ltd. ("Cresyn"), Kaedar

27   Electronics Co., Ltd ("Kaedar"), Jin Li Mould Manufacturing Pte. Ltd. ("Jin Li Mould"),

28   Glocom/Lateral Solutions Pte. Ltd. ("Glocom"), Nishoku Technology, Inc. ("Nishoku"), and

1    Fastening Technologies Pte. Ltd. ("Fast Tech") (collectively, the "Targeted Suppliers").

2        19.    As one of Apple's Global Supply Managers, Devine interacted with suppliers as

3    Apple's representative and evaluated these companies as potential sources for mechanical parts

4    and assembly of certain Apple products.  Devine had access to Apple's Confidential

5    Information, including Apple's proprietary information about new products and confidential

6    component and pricing information from many of Apple's suppliers.  Devine was entrusted with

7    and authorized to use Apple's Confidential Information during the procurement process only in

8    a manner that served the best interests of Apple and its customers.  Devine was expressly

9    prohibited from using Apple's Confidential Information for his own benefit or for the benefit of

10   third parties.

11       20.    Devine, in direct violation of Apple's policies and federal and state law,

12   demanded and received illicit payments, kickbacks, bribes and other things of value from the

13   Targeted Suppliers and, in exchange, provided the Targeted Suppliers with Apple's Confidential

14   Information.  In designing and carrying out this unlawful scheme, Devine engaged in domestic

15   and international travel, utilized the internet and other means of interstate electronic

16   communications, and made numerous bank wire transfers in interstate and international

17   commerce, all with the intent to execute his scheme.

18       21.    Apple is informed and believes, and on that basis alleges, that knowing that he

19   would receive illicit payments, kickbacks, bribes, and other things of value from the Targeted

20   Suppliers, and as an inducement and in exchange therefore, Devine provided the Targeted

21   Suppliers with Apple's Confidential Information at various times from October 2006 through

22   the filing of this Complaint.  Devine disclosed Apple's Confidential Information to the Targeted

23   Suppliers with the intent that they would use the information to construct offers to Apple to

24   supply mechanical parts for and/or assemble certain Apple products, or to otherwise benefit the

25   Targeted Suppliers' business interests.  Devine knew that with Apple's Confidential

26   Information, the Targeted Suppliers would be able to craft offers to Apple on terms more

27   favorable to the Targeted Suppliers, and less favorable to Apple.

28       22.    Apple is informed and believes, and on that basis alleges, that the Targeted

6

1    Suppliers used Apple's Confidential Information given to them by Devine at various times from

2    October 2006 through the filing of this Complaint to construct their offers to Apple to supply

3    mechanical parts for and/or assemble certain Apple products, or to otherwise benefit the

4    Targeted Suppliers' business interests.  With Apple's Confidential Information, the Targeted

5    Suppliers were able to construct offers on terms more favorable to the Targeted Suppliers, and

6    less favorable to Apple.

7           23.     Apple is informed and believes, and on that basis alleges, that knowing that he

8    would receive illicit payments, kickbacks, bribes, and other things of value from the Targeted

9    Suppliers if the Targeted Suppliers were awarded supply agreements, Devine took steps to

10   ensure that Apple would accept business offers from the Targeted Suppliers, the terms of which

11   were, unbeknownst to Apple, based at least in part on Apple's Confidential Information that

12   Devine had unlawfully disclosed.

13          24.     Apple is informed and believes, and on that basis alleges, that Devine structured

14   and received payments from the Targeted Suppliers in ways designed to avoid detection.

15   Devine has opened as many as 14 deposit accounts in the United States and overseas in order to

16   accept and receive illicit payments, bribes, and kickbacks from the Targeted Suppliers.  Devine

17   opened numerous bank accounts in the names of Defendant CPK Engineering, Inc. and Jung

18   Hyun Yun, his wife, and has caused illicit payments, bribes and kickbacks that he received from

19   the Targeted Suppliers to be deposited and/or wired into these bank accounts.

20          25.     In reliance on Devine's purported expertise, skill, judgment, loyalty and

21   trustworthiness as a fiduciary and an employee, Apple entered into supply agreements with the

22   Targeted Suppliers for mechanical parts or for the assembly of Apple products at various times

23   from October 2006 through the filing of this Complaint.

24          26.     Apple is informed and believes, and on that basis alleges, that had Devine not

25   demanded and received illicit payments, kickbacks, bribes, and other things of value from the

26   Targeted Suppliers, and had Devine not unlawfully disclosed Apple's Confidential Information

27   to the Targeted Suppliers, Apple would have ultimately paid less for mechanical parts or for the

28   assembly of Apple products.

COMPLAINT

1    27.    Apple is informed and believes, and on that basis alleges, that Devine's unlawful

2    disclosures of Apple's Confidential Information damaged Apple.

3    28.    Apple is informed and believes, and on that basis alleges, that Devine carried out

4    his fraudulent scheme with the Targeted Suppliers in the following manner:

5    **Cresyn**

6    29.    Cresyn is a foreign company with its headquarters in South Korea. Cresyn has

7    entered into agreements with Apple to assemble headsets for new Apple products using parts

8    received from other suppliers. At all times relevant herein, Cresyn has competed with at least

9    one other supplier for Apple's business.

10    30.    From at least February 2007 through the filing of this Complaint, Devine

11    demanded and received illicit payments, kickbacks, bribes and other things of value from Cresyn

12    and, in exchange, Devine provided Cresyn with Apple's Confidential Information.

13    31.    Apple is informed and believes, and on that basis alleges, that Devine entered

14    into covert side agreements with Cresyn wherein Devine provided Cresyn with Apple's

15    Confidential Information. In exchange, Cresyn provided Devine with illicit payments,

16    kickbacks, bribes, and other things of value. For example, on or around March 2007, Devine

17    entered into a written covert side agreement with Cresyn, whereby Cresyn was obligated to

18    make monthly payments of $6,000 to Devine. In exchange, Devine agreed to provide Cresyn

19    with certain "consulting services," that entailed the disclosure of Apple Confidential Information

20    to Cresyn. (*See generally* Exhibit A.) Article 3 of the agreement lists more than 30 types of

21    Apple Confidential Information that Devine would provide to Cresyn, including, but not limited

22    to, Apple sales volume forecast information, product specifications, competitors' target prices,

23    and guidance and updates on the approval of Cresyn's and its competitors' bids. (*See* Exhibit A,

24    §§ 1-3.) The stated purpose of the covert side agreement was for Devine to provide "consulting

25    services to support the sale of products manufactured by [Cresyn] to Apple Inc. customers, thus

26    supporting the business activities of [Cresyn]." (*See* Exhibit A, § 1.)

27    32.    According to its terms, Devine's March 2007 covert side agreement with Cresyn

28    expired after 12 months. Devine entered into virtually identical covert side agreements with

1    Cresyn in or around March 2008 and March 2009 whereby Cresyn was obligated to make

2    monthly payments to Devine in exchange for Devine providing Cresyn with Apple's

3    Confidential Information. (*See generally* Exhibits B and C.)

4         33.    Apple was not a party to these covert side agreements between Devine and

5    Cresyn, and had no knowledge of their existence.

6         34.    Devine did not give to Apple and Apple did not receive the illicit payments made

7    to Devine pursuant to these covert side agreements.

8         35.    E-mail correspondence between Devine (from his Hotmail and/or Gmail e-mail

9    accounts) and Cresyn employees confirms that Devine, at various times from 2007 through the

10   filing of this Complaint and pursuant to the various agreements with Cresyn described above,

11   received illicit payments, kickbacks, bribes and other things of value from Cresyn in exchange

12   for Devine providing Cresyn with Apple's Confidential Information.  Such conduct included,

13   without limitation:

    a.    On November 30, 2007, Devine e-mailed Andy Yang of Cresyn information regarding pricing offered to Apple by a Cresyn competitor, and a roadmap for certain Apple projects.  On December 3, 2007, Devine wrote to Yang: "In the meantime, can you check with your Accounting dept?  I have not received the Nov payment yet."

    b.    On January 11, 2008, Devine e-mailed Yang Apple's confidential sales forecast information concerning multiple Apple products, including the iPod and iPhone, and information regarding actual sales for 2007.

    c.    On March 23, 2008, Devine e-mailed Yang Apple's confidential sales forecast information for 2008 concerning multiple Apple products, including the new unreleased iPod and iPhone.

    d.    On August 4, 2008, Devine e-mailed Apple management from his Apple e-mail address that he "would like to get Cresyn qualified [*i.e.*, approved to supply]" for a new product.  On August 5, 2008, Devine forwarded this same e-mail to Yang and requested that Yang "talk to [Cresyn's] Accounting Dept for August."  Yang replied that this conversation should continue on Hotmail e-mail accounts.

    e.    On September 8, 2008, Devine e-mailed Yang Apple's confidential iPod Shuffle forecast sales for 2008.

    f.    On September 23, 2008, Devine e-mailed Yang Apple's confidential actual sales and forecast information for the iPod and iPhone for 2008.

9

g.   On January 8, 2009, Devine e-mailed Yang a list of production problems experienced by a competing supplier, which would allow Cresyn to strengthen its bargaining position over Apple.

h.   On January 29, 2009, Devine e-mailed Yang confidential Apple information regarding proposed engineering material changes and estimated demand for Apple's iPod and iPhone projects. Attached to this e-mail was an internal Apple Confidential-Strictly-Need-to-Know document that showed the project status, projected cost and roadmap for all of Apple's iPod and iPhone accessories programs. On January 30, 2009, a bank account in the name of Devine's wife received a wire transfer in the amount of $6,000 from Cresyn.

i.   On February 2, 2009, Devine e-mailed Yang highly confidential Apple information regarding actual sales of various Apple products in 2008, projected sales in 2009 and estimated product costs. On February 19, 2009 a bank account in the name of Devine's wife received a wire transfer in the amount of $6,000.

j.   On February 4, 2009, Devine e-mailed Yang confidential 2008 iPod volumes by various manufacturers and forecasted 2009 volumes.

k.   On March 6, 2009, Devine e-mailed Yang information regarding pricing offered to Apple by a Cresyn competitor.

l.   On June 25, 2009, Devine e-mailed Yang Apple's confidential sales forecast information concerning Apple's iPhone. Devine wrote: "Please be careful as this is highly confidential." On July 15, 2009, a bank account in the name of Devine's wife received a wire transfer in the amount of $4,000 from Cresyn.

m.   On August 27, 2009, Devine e-mailed Apple employee Lane Kato and requested cost information for various suppliers, including a Cresyn competitor, purportedly for purposes of an accuracy review with Devine's supervisor. This statement was false because there was no such review with Devine's supervisor. On September 24, 2009, Devine e-mailed the confidential cost information provided by Kato to Yang.

36.   All of Apple's Confidential Information provided by Devine to Cresyn in exchange for the illicit payments, kickbacks, and bribes described above was of a confidential, proprietary and secret nature and/or constituted Apple's trade secrets.

37.   Devine concealed his illegal relationship with Cresyn by structuring and receiving payments in ways designed to avoid detection. For example, on February 8, 2007, Devine e-mailed Yang: "I prefer to do the transaction in Travelers Checks or by cash, without involving any banks. Can you see if that is possible? I know it's a bit more work but working

1   with Travelers checks have [sic] been very effective in my past experience." Later, Devine

2   arranged to have Cresyn send payments via bank wire. Devine and Yang exchanged at least 19

3   e-mails between April 24, 2007 and March 18, 2010 regarding Cresyn's monthly payments to

4   Devine. For example, on October 5, 2007, Devine e-mailed Yang: "I still haven't received Sept

5   payment. Can you check with your Accounting Dept? Please do not send the Sept and Oct

6   payment together in one wire transfer. Anything over $10,000 wired could draw too much

7   attention." Devine also arranged for Cresyn to send payments to bank accounts in the name of

8   his wife or Defendant CPK Engineering in order to avoid detection. For example, a bank

9   account in the name of Devine's wife received at least 11 wire transfer deposits from Cresyn

10   totaling $46,000 in 2009. In November 2009, Devine e-mailed Yang and requested that Cresyn

11   "move the wiring of monthly consulting fees to [CPK Engineering's bank] account . . . ."

12        38.     Devine undertook other significant measures to conceal his fraudulent scheme

13   from Apple. For example, on September 16, 2008, Devine e-mailed Andy Yang of Cresyn: "I

14   received your email on my Apple email account. Please avoid using that email as Apple IT

15   team will randomly scan emails for suspicious email communications for forecast, cost and new

16   model information." In this same e-mail, Devine then provided Cresyn with confidential

17   forecast information for several Apple products. In order to avoid using his Apple e-mail

18   account to deliver this information to Cresyn, Devine took images of his internal Apple e-mail

19   and e-mailed those images to Cresyn via his Hotmail account. Also, on May 16, 2008, after e-

20   mailing confidential supplier information and pricing for iPhone cameras to Cresyn, Devine

21   instructed Cresyn to "not mention that you received the contact window from me. It makes the

22   internal discussion very complex for me."

23        39.     Apple is informed and believes, and on that basis alleges, that Devine disclosed

24   Apple's Confidential Information to Cresyn with the intent that Cresyn would use the

25   information to construct its offers to Apple to assemble certain Apple products, to gain an unfair

26   advantage in the contracting process, or to otherwise benefit Cresyn's business interests, not

27   Apple's. With Apple's Confidential Information, Cresyn was able to construct offers to Apple

28   on terms more favorable to Cresyn, and less favorable to Apple. At all relevant times herein,

1    Devine was contractually prohibited from disclosing Apple's Confidential Information to

2    Cresyn for this purpose.

3    **Jin Li Mould**

4         40.    Jin Li Mould is a foreign company with its headquarters in Singapore. It is

5    affiliated with E'Mold Manufacturing Co. Ltd., which has its headquarters in China. Jin Li

6    Mould has entered into agreements with Apple to supply mechanical parts for certain Apple

7    products. At all times relevant herein, Jin Li Mould has competed with a number of other

8    suppliers for Apple's business.

9         41.    From at least October 2006 through the filing of this Complaint, Devine

10   demanded and received illicit payments, kickbacks, bribes and other things of value from Jin Li

11   Mould and, in exchange, Devine provided Jin Li Mould with Apple's Confidential Information.

12        42.    Apple is informed and believes, and on that basis alleges, that Devine entered

13   into covert side agreements with Jin Li Mould wherein Devine provided Jin Li Mould with

14   Apple's Confidential Information. In exchange, Jin Li Mould paid Devine "commissions" on

15   Apple's purchases of Jin Li Mould's tooling and mechanical parts. Devine split these

16   "commissions" with Jin Li Mould employee Andrew Ang, who served as a broker in these

17   unlawful transactions between Jin Li Mould and Devine, as well as between other suppliers and

18   Devine. In May or June 2009, subsequent to the departure of Ang from Jin Li Mould, Devine

19   entered into an agreement with Jacky Chua of Jin Li Mould to maintain the covert side

20   agreements with Jin Li Mould. In furtherance of this agreement, Devine e-mailed Ang on May

21   1, 2009 a message for Chua regarding "the sample [*i.e.*, payment] plan we discussed a few

22   weeks ago" and proposed that Devine and Chua meet in person in China.

23        43.    Apple is informed and believes, and on that basis alleges, that from October 2006

24   through the filing of this Complaint, Jin Li Mould paid Devine approximately $1,000,000 in

25   "commissions," of which approximately 15-20% was shared with Ang. Devine and Ang

26   maintained an Excel spreadsheet to track their illegal profits. The spreadsheet tracked and

27   detailed illicit payments to Devine and Ang from October 2006 through March 2009.

28        44.    Apple was not a party to these covert side agreements between Devine and Jin Li

12

1    Mould, Devine and Ang, or Devine and Chua, and had no knowledge of their existence.

2         45.    Devine did not give to Apple and Apple did not receive the illicit payments made

3    to Devine pursuant to these covert agreements.

4         46.    E-mail correspondence between Devine (from his Hotmail and/or Gmail e-mail

5    accounts), Ang, Chua, and other Jin Li Mould employees confirms that Devine, at various times

6    from 2006 through the filing of this Complaint and pursuant to the agreements with Jin Li

7    Mould alleged above, received illicit payments from Jin Li Mould in exchange for Devine

8    providing Jin Li Mould with Apple's Confidential Information.  Such conduct included, without

9    limitation:

a.   On March 25, 2007, Devine forwarded to Ang price quotes from a Jin Li
     Mould competitor for parts and tools for the iPod Touch.

b.   On July 2, 2007, Devine e-mailed Ang a Jin Li Mould competitor's
     photographs of iPhone packaging fixtures.

c.   On November 1, 2007, Devine e-mailed Ang information regarding the
     iPod Classic pricing offered to Apple by a Jin Li Mould competitor.

d.   On or about February 5, 2008, Devine e-mailed Ang confidential Apple
     information regarding the allocation of Apple's supply agreements among
     its various suppliers.

e.   On February 16, 2008, Devine e-mailed Ang confidential drawings of
     Apple's USB Power Adapter for the European Union.

f.   On April 11, 2008, Devine e-mailed Ang information regarding a Jin Li
     Mould competitor's tooling capacity for stereo headset parts.

g.   On July 3, 2008, Devine e-mailed Ang information regarding iPod Touch
     packaging pricing offered to Apple by a competing supplier.

h.   On July 17, 2008, Devine e-mailed Ang information regarding power
     adaptor pricing offered to Apple by a Jin Li Mould competitor.

i.   On August 4, 2008, Devine e-mailed Ang information regarding headset
     pricing offered to Apple by a Jin Li Mould competitor.

j.   On October 28, 2008, Devine e-mailed Ang information regarding iPod
     Shuffle pricing offered to Apple by a Jin Li Mould competitor.

k.   On November 10, 2008, Devine e-mailed Ang an image of Apple's
     eApproval system, which showed confidential tooling quotes for the iPod

13

Shuffle from a Jin Li Mould competitor.

l.    On November 14, 2008, Devine and Ang e-mailed regarding the allocation of Apple's supply agreements between Jin Li Mould and Kaedar. Ang requested that he and Devine contact Betty Wu of Kaedar "to work together now to stand on pricing." Devine confirmed to Ang the price quoted by Kaedar and his desired allocation of Apple's business for this part, which would "be fair to all parties." Devine continued: "I do not want Kaedar to take 100% allocation. That's not good for sample plan [*i.e.*, payments]."

m.    On December 17, 2008, Devine e-mailed Ang information regarding a Jin Li Mould competitor's production schedule for stereo headset parts.

n.    On March 9, 2009, Devine e-mailed Ang information regarding pricing offered to Apple by a Jin Li Mould competitor. Devine informed Ang that the competitor offered Apple a price of $0.04 for certain parts, and that Apple "is looking for 0.01" but "0.02 might be ok."

o.    On March 31, 2009, Devine e-mailed Ang Apple's confidential target pricing and competitor pricing on projects for iPod and iPhone stereo headsets, which would allow Jin Li Mould to strengthen its bargaining position over Apple.

p.    On May 11, 2009, Devine e-mailed Chua a proposal for the structure and frequency of Jin Li Mould's payments to Devine. Devine and Chua agreed that Jin Li Mould would pay Devine $700,000 over a five-month period.

q.    On June 15, 2009, Devine e-mailed Ang to inform him that Devine "received 80K [Singapore Dollars]" from an Apple supplier and that Ang's portion was $12,200 Singapore Dollars.

r.    On June 16, 2009, Devine e-mailed Chua that Devine "will continue to provide [Jin Li Mould] with information & opportunities to keep your business growing." Devine then thanked Chua for the payment of $90,000 and informed him that the outstanding balance owed was $310,000 and Jin Li Mould shares of stock worth $400,000. On the same day, Devine e-mailed Chua and Andric Ng of Jin Li Mould pricing information from a Jin Li Mould competitor.

s.    On July 29, 2009, Devine e-mailed Chua confidential information concerning the machine rates that certain Jin Li Mould competitors had provided to Apple. Devine wrote: "Pls be careful with the data."

47.    All of Apple's Confidential Information provided by Devine to Jin Li Mould in exchange for the illicit payments, kickbacks, and bribes described above was of a confidential, proprietary and secret nature and/or constituted Apple's trade secrets.

48.    Devine concealed his illegal relationship with Jin Li Mould by structuring and

14

receiving payments in ways designed to avoid detection. Apple is informed and believes, and on that basis alleges, that Devine and Ang coordinated meetings in Asia wherein Ang and Devine exchanged payments. For example, on January 22, 2008, Ang and Devine e-mailed regarding scheduling a meeting in Macau: "Have check [sic] with my boss that we probably have to meet in macau for the samples [*i.e.*, payments]." On October 14, 2008, Ang stated in an e-mail that Devine would "be in macau for the collection" and that Ang would "collect from him [unknown individual] whatever amount he prepare [sic] and will pass to you on our next meeting." Devine also evaded detection by arranging for illegal commissions to be deposited in overseas accounts. For example, on July 21, 2009, Devine e-mailed Ang wire information for a bank account in Singapore into which Ang should deposit $7,000.

49.     Apple is informed and believes, and on that basis alleges, that Devine disclosed Apple's Confidential Information to Jin Li Mould with the intent that Jin Li Mould would use the information to construct offers to Apple to supply mechanical parts for certain Apple products, to gain an unfair advantage in the contracting process, or to otherwise benefit Jin Li Mould's business interests, not Apple's. With Apple's Confidential Information, Jin Li Mould was able to construct offers to Apple on terms more favorable to Jin Li Mould, and less favorable to Apple. At all relevant times herein, Devine was expressly prohibited from disclosing Apple's Confidential Information to Jin Li Mould for this purpose.

**Kaedar**

50.     Kaedar is a foreign company with its headquarters in China. Kaedar has entered into agreements with Apple to supply mechanical parts for certain Apple products. At all times relevant herein, Kaedar has competed with a number of other suppliers for Apple's business.

51.     From at least March 2008 through the filing of this Complaint, Devine demanded and received illicit payments, kickbacks, bribes and other things of value from Kaedar and, in exchange, Devine provided Kaedar with Apple's Confidential Information.

52.     Apple is informed and believes, and on that basis alleges, that Devine entered into covert side agreements with Kaedar wherein Devine provided Kaedar with Apple's Confidential Information. In exchange, Kaedar provided Devine with illicit payments,

15

1     kickbacks, bribes, and other things of value.

2         53.     Apple was not a party to these covert side agreements between Devine and

3     Kaedar, and had no knowledge of their existence.

4         54.     Devine did not give to Apple and Apple did not receive the illicit payments made

5     to Devine pursuant to these covert side agreements.

6         55.     E-mail correspondence between Devine (from his Hotmail and/or Gmail e-mail

7     accounts) and Betty Wu, a Kaedar employee, confirms that Devine, at various times from 2008

8     through the filing of this Complaint and pursuant to the agreements with Kaedar alleged above,

9     received illicit payments from Kaedar in exchange for Devine providing Kaedar with Apple's

10     Confidential Information. Such conduct included, without limitation:

       a.     On July 8, 2008, Devine e-mailed Betty Wu of Kaedar confidential information related to Apple's iPhone, including information regarding unreleased models and potential suppliers for parts: "At the moment, Apple is considering to work with [competing suppliers] for iPhone [sic]. Apple will likely have 2 or 3 iPhone models in 2009."

       b.     On or about February 4, 2009, Devine e-mailed Wu to inquire about the status of a payment from Kaedar to Devine: "Will there be any transfer to Korea this month? Let me know." On or about February 3, 2009, Wu replied to Devine: "The transfer will be made this week." On or about February 9, 2009, Devine again e-mailed Wu regarding payment: "[C]an you check on transfer? I did not see any transfer this week." Wu responded on February 10, 2009: "This week will transfer four time,I will sent to you bank note [sic]." Wu then attached the bank note for the first transfer.

       c.     On March 1, 2009, Devine e-mailed Wu a product design and price quote provided to Apple by a Kaedar competitor.

       d.     On March 2, 2009, Devine e-mailed Wu a Design for Manufacturing presentation provided to Apple by a Kaedar competitor, which summarized the competitor's manufacturing plans for a component part.

       e.     On or about March 4, 2009, Devine e-mailed Wu to inquire about the status of a payment from Kaedar to Devine: "Transfer this week?" Wu replied: "My colleague has begun to work on it. will [sic] be out in several days."

       f.     On or about March 9, 2009, Devine e-mailed Wu to inquire about the status of a payment from Kaedar to Devine: "[A]ny news on the transfer for this month?" Wu replied: "The transfer was made on Monday Chinese Time. It was break [sic] into 4 payments."

16

g.   On May 11, 2009, Devine e-mailed Wu step-by-step instructions on how Kaedar should negotiate with Apple in order to obtain money from Apple for purchasing new manufacturing tools. Devine wrote: "I am trying to get some money for the new tools. I will propose 5 new sets. 1) I will ask you to send me a quote for 5 new sets at full price ($120k x 5 = $600K). 2) I will then say too expensive  3) I will suggest that you pay for 2 tool sets ($240K) and Apple pay for 3 tool sets ($360K). Which means I will try to get about $360K USD for Kaedar. What do you think?"

h.   On June 3, 2009, Devine e-mailed Wu to inquire about the status of a payment from Kaedar to Devine: "Any transfer this month?" Wu replied: "The transfer will be made next week." On June 12, 2009, Devine again inquired about the payment: "Can you check with your bank about transfer? My side is not showing receipt." Wu replied: "I have called my colleague and their confirmation is that the transfer will be only made once a month, 17th of each month, so you are expected to receive the next Thursday [sic]."

i.   On June 17, 2009, Devine e-mailed Wu the prices paid by Apple for iPod Touch parts, as well as the allocation of Apple business among various suppliers.

j.   On July 9, 2009, Devine e-mailed Wu to request that Kaedar make a transfer into an HSBC bank account that Devine opened in Korea: "I opened an HSBC account in Korea. But I was a bit short of funds to be the Premier status. Can you possibly send $30K USD to my new HSBC account as soon as possible? Perhaps two transfers in the amount of $15k?"

k.   On July 10, 2009, Devine e-mailed Wu to request that all future payments from Kaedar to Devine be transferred to a Shinhan Bank account that Devine opened in Korea: "I also have a new monthly account in Korea. For future monthly transfers, please send to this account. Bank Name: Shinhan Bank."

l.   On August 3 2009, Devine e-mailed Wu a Design for Manufacturing presentation provided to Apple by a Kaedar competitor, which summarized the competitor's manufacturing plans for a component part.

m.   On August 20, 2009, Devine e-mailed Wu requesting the schedule of payments from Kaedar to Devine: "Can you send me sample [*i.e.*, payment] schedule when you have a chance? Please send to this email [Devine's hotmail e-mail account address]." On September 11, 2009, Wu replied that $11,548 was transferred into Devine's bank account on July 20; $16,288 was transferred into Devine's bank account on August 21; and $19,260 was transferred into Devine's bank account on September 3. Later that same day, Devine replied: "Thanks for your input. But my banks [sic] statement shows only 7/20 transfer. Can you tell me the account number for 8/21 and 9/3 transferred [sic]?" Wu responded by identifying a bank account at Shinhan Bank in Seoul, South Korea, and by identifying the account holder as "Paul Devine." On September 13, 2009, Devine responded: "The bank account number is correct but my bank states that it

17

has only received a transfer on JULY 22nd in the amount of $11,448[.]  The Aug and Sept transfers are missing.  But, I will ask my banker to personally check the status one more time and get back to you."  On September 16, 2009, Devine e-mailed Wu and confirmed that "[e]verything has been received by my bank."  Devine and Wu then agreed that Wu would send an additional $45,000 in multiple payments.  Wu then arranged to send $57,052 in transfers between September 16 and September 23, 2009.

n.   On December 17, 2009, Devine e-mailed Wu regarding a new bank account into which Kaedar should wire its payments to Devine: "I met with a banker because they want to upgrade me to VIP member.  So, I had to change my account number.  Can you inform your bank to use the new account number for sample [i.e., payment] transfer?"  Devine's e-mail included information for a bank account at Shinhan Bank in Korea.  On December 27, 2009, Wu replied that, between December 15, 2009 and December 21, 2009, Kaedar had already transferred $36,481.68 to Devine's former bank account.

o.   On January 27, 2010, Devine e-mailed Wu information regarding pricing offered to Apple by a Kaedar competitor for the iPhone 4 case.  Devine asked Wu: "Can you compare [Kaedar's] pricing vs [the competitor's] and send me a summary table to this email?"  Wu responded by comparing Kaedar's prices to the competitor's prices.

p.   On February 22, 2010, Devine e-mailed Wu information regarding pricing offered to Apple by a Kaedar competitor for tooling parts.  Wu later replied: "So do you think it is necessary to adjust my tooling quotation?"  Approximately ten days later, Devine informed Wu that Apple's demand for the part declined, and that Kaedar and the competitor would both provide four sets of parts.

q.   On March 9, 2010, Wu e-mailed Devine: "The bank begins to inquire about the fixed monthly transfer to a personal account, so is it possible for you to give me a registered company bank account which is safe?" On March 18, 2010, Devine replied: "I understand.  I will find a solution for it in Korea soon.  In the meantime, can you send to this account?  I set up this account in USA.  But the tax is very high so I will need to find a solution in Korea very soon."  Devine's e-mail included information for a Chase Bank account in Santa Clara, California in the name of CPK Engineering, Inc.

56.   All of Apple's Confidential Information provided by Devine to Kaedar in exchange for the illicit payments, kickbacks, and bribes described above was of a confidential, proprietary and secret nature and/or constituted Apple's trade secrets.

57.   Devine concealed his illegal relationship with Kaedar by structuring and receiving payments in ways designed to avoid detection.  For example, on April 30, 2009, Devine e-mailed Chan: "[P]lease find the bank information for Korea.  If you can make the

COMPLAINT

1    transfers below $10K (like $9K) would be good to avoid some attention [sic]."

2        58.    Apple is informed and believes, and on that basis alleges, that Devine disclosed

3    Apple's Confidential Information to Kaedar with the intent that Kaedar would use the

4    information to construct offers to Apple to supply component materials for certain Apple

5    products, to gain an unfair advantage in the contracting process, or to otherwise benefit Kaedar's

6    business interests, not Apple's.  With Apple's Confidential Information, Kaedar was able to

7    construct offers to Apple on terms more favorable to Kaedar, and less favorable to Apple.  At all

8    relevant times herein, Devine was expressly prohibited from disclosing Apple's Confidential

9    Information to Kaedar for this purpose.

10   **Glocom**

11       59.    Glocom and its affiliate Lateral Solutions (collectively, "Glocom") are foreign

12   companies with their headquarters in Singapore.  Glocom has entered into agreements with

13   Apple to supply mechanical parts for certain Apple products.   At all times relevant herein,

14   Glocom has competed with a number of other suppliers for Apple's business.

15       60.    From at least December 2007 through the filing of this Complaint, Devine

16   demanded and received illicit payments, kickbacks, bribes and other things of value from

17   Glocom and, in exchange, Devine provided Glocom with Apple's Confidential Information.

18       61.    Apple is informed and believes, and on that basis alleges, that Devine entered

19   into covert side agreements with Glocom wherein Devine provided Glocom with Apple's

20   Confidential Information.  In exchange, Glocom paid Devine "commissions" on Apple's

21   purchases of Glocom commodities.  Devine split these "commissions" with Andrew Ang, who

22   served as a broker in transactions between Glocom and Devine, as well as between other

23   suppliers and Devine.  Devine and Ang maintained an Excel spreadsheet to track at least some

24   portion of their illegal profits from Glocom.  The spreadsheet tracked and detailed illicit

25   payments to Devine and Ang from December 2008 through at least March 2009.  For example,

26   the spreadsheet shows that Devine received $16,000 from Glocom on December 15, 2008.  Ang

27   received $4,000.

28       62.    Apple was not a party to these covert side agreements between Devine and

1    Glocom and between Devine and Ang, and had no knowledge of their existence.

2          63.    Devine did not give to Apple and Apple did not receive the illicit payments made

3    to Devine pursuant to these covert side agreements.

4          64.    E-mail correspondence between Devine (from his Hotmail and/or Gmail e-mail

5    accounts), Ang and Glocom employees confirms that Devine, at various times from 2007

6    through the filing of this Complaint and pursuant to the agreement with Glocom alleged above,

7    received illicit payments from Glocom in exchange for Devine providing Glocom with Apple's

8    Confidential Information. Such conduct included, without limitation:

9          a.    On December 27, 2007, a different Global Supply Manger from Apple
            contacted Lionel Chan from Glocom to determine whether Glocom could
10           supply certain component materials for Apple's iPod Touch. On January 7,
            2008, Chan forwarded the e-mail to Ang, who then forwarded the e-mail to
11           Devine.

12         b.    On January 7, 2008, Chan sent Ang an e-mail from his personal e-mail
            account that attached a spreadsheet containing information regarding Apple
13           component parts, including project part numbers, descriptions and
            quantities per day. On that same day, Ang forwarded the e-mail and
14           spreadsheet to Devine. Later that same day, Devine replied to Ang: "I
            have added December (current pricing) in column H." The "current
15           pricing" supplied by Devine was confidential.

16         c.    On February 26, 2008, Chan e-mailed Ang Glocom's price quotation that it
17           planned to make to Apple for headphone component parts. On February
            27, 2008, Ang forwarded Chan's e-mail and wrote to Devine: "please
18           review accordingly. I guess Lionel [Chan] has put in extra cost . . . so we
            need something from here . . . please advise." Later that same day, Devine
19           replied: "Looks ok. I will try to get this accepted by Micah [an Apple
            Global Supply Manager]." On or about February 28, 2008, Devine advised
20           Ang that "Micah wants 12 cents [but] 17 would do."

21         d.    On April 15, 2008, Ang e-mailed Devine information regarding pricing
22           that Glocom was considering offering to Apple. Ang wrote to Devine:
            "Please see below quoted pricing from Glocom . . . Need some indication
23           on pricing." Ang also stated that the "samples [i.e., payments]" that Ang
            and Devine would receive should Glocom be awarded the contract would
24           be "US$0.03 each part." On April 18, 2008, Devine replied to Ang:
            "Micah [an Apple Global Supply Manager] is expecting 10~12 cents so 22
25           [cents] may be too high. Can they do 18?" Later that same day Devine
            again replied to Ang's e-mail: "Disregard my earlier email about 18 cents.
26           22 is ok."

27         e.    On September 4, 2008, Devine e-mailed Ang information regarding pricing
            offered to Apple by a competitor of Glocom.
28

20

f.   On December 3, 2008, Devine e-mailed Chan confidential information regarding component parts for Apple's iPod Touch, the suppliers that provided those component parts to Apple, and the cost.

g.   On December 15, 2008, Devine e-mailed Chan confidential information regarding component parts for Apple's iPod Shuffle, the suppliers that provided those component parts to Apple, and the cost.

h.   On February 15, 2009, an Apple Operations Program Manager e-mailed Chan and asked that Glocom provide Apple with a price quote for an Apple part. Chan forwarded the request to a team of Glocom employees, but blind copied Devine. On February 16, 2009, Devine replied to Chan: "I think we want to fly under the radar as discussed. No more than $0.02 per piece."

i.   On March 24, 2009, Devine and Ang e-mailed regarding the collection of payments from Glocom, and the tracking of such payments in their spreadsheet.

65.   All of Apple's Confidential Information provided by Devine to Glocom in exchange for the illicit payments, kickbacks, and bribes described above was of a confidential, proprietary and secret nature and/or constituted Apple's trade secrets.

66.   Apple is informed and believes, and on that basis alleges, that Devine disclosed Apple's Confidential Information to Glocom with the intent that Glocom would use the information to construct offers to Apple to supply component materials for certain Apple products, to gain an unfair advantage in the contracting process, or to otherwise benefit Glocom's business interests, not Apple's. With Apple's Confidential Information, Glocom was able to construct offers to Apple on terms more favorable to Glocom, and less favorable to Apple. At all relevant times herein, Devine was expressly prohibited from disclosing Apple's Confidential Information to Glocom for this purpose.

**Nishoku**

67.   Nishoku is a foreign company with its headquarters in Taiwan. Nishoku has entered into agreements with Apple to supply mechanical parts for certain Apple products. At all times relevant herein, Nishoku has competed with a number of other suppliers for Apple's business.

68.   From at least March 2009 through the filing of this Complaint, Devine demanded

and received illicit payments, kickbacks, bribes and other things of value from Nishoku and, in exchange, Devine provided Nishoku with Apple's Confidential Information.

69.     Apple is informed and believes, and on that basis alleges, that Devine entered into covert side agreements with Nishoku wherein Devine provided Nishoku with Apple's Confidential Information.  In exchange, Nishoku provided Devine with illicit payments, kickbacks, bribes, and other things of value.

70.     Apple was not a party to these covert side agreements between Devine and Nishoku, and had no knowledge of their existence.

71.     Devine did not give to Apple and Apple did not receive the illicit payments made to Devine pursuant to these covert side agreements.

72.     E-mail correspondence between Devine (from his Hotmail and/or Gmail e-mail accounts) and Yvonne Wu, a Nishoku employee, confirms that Devine, at various times from 2009 through the filing of this Complaint and pursuant to the agreements with Nishoku alleged above, received illicit payments from Nishoku in exchange for Devine providing Nishoku with Apple's Confidential Information.  Such conduct included, without limitation:

a.     On May 7, 2009, Devine e-mailed Wu wire information for a Shinhan Bank account in Seoul, South Korea in Devine's wife's name.

b.     On June 9, 2009, Devine e-mailed Wu to inquire about a payment from Nishoku to Devine: "Yvonne, Can you let me know the amount that was transferred?"  Wu replied: "TransferDear [sic] Paul, amount = $27,700.84, maybe deduced [sic] some handling fee . . . ."

c.     On July 10, 2009, Devine e-mailed Wu regarding logistics for future payments by Nishoku to Devine: "Hello Yvonne, How are you?  For future samples [*i.e.*, payments], can you send to this new account?  Bank Name Shinhan Bank . . . Also, can you make sure that each sample [*i.e.*, payment] transfer is less than 20K?"  On July 27, 2009, Devine again e-mailed Wu: "By the way, the account holder name is Paul Devine."

d.     On August 4, 2009, Wu e-mailed Devine regarding Nishoku's plans for a future offer to Apple: "Plan to provide around 2% cost down for [various headsets], pls advise if any idea [sic] about the proposal.  By the way, we heard that there might be 2nd source for [project part], right?"  Devine replied: "I think 2% should be fine.  We are looking at [another Apple supplier] for [queried project part]."

73.     All of Apple's Confidential Information provided by Devine to Nishoku in

22

exchange for the illicit payments, kickbacks, and bribes described above was of a confidential, proprietary and secret nature and/or constituted Apple's trade secrets.

74.     Apple is informed and believes, and on that basis alleges, that Devine disclosed Apple's Confidential Information to Nishoku with the intent that Nishoku would use the information to construct offers to Apple to supply component materials for certain Apple products, to gain an unfair advantage in the contracting process, or to otherwise benefit Nishoku's business interests, not Apple's. With Apple's Confidential Information, Nishoku was able to construct offers to Apple on terms more favorable to Nishoku, and less favorable to Apple. At all relevant times herein, Devine was expressly prohibited from disclosing Apple's Confidential Information to Nishoku for this purpose.

**Fast Tech**

75.     Fast Tech is a foreign company with its headquarters in Singapore. Fast Tech has entered into agreements with Apple to supply tooling materials for certain Apple products. At all times relevant herein, Fast Tech has competed with a number of other suppliers for Apple's business.

76.     Based upon the e-mail correspondence cited hereafter, the pattern of Devine's scheme, and Devine's course of conduct, Apple is informed and believes, and on that basis alleges, that from at least November 2008 through the filing of this Complaint, Devine entered into covert side agreements with Fast Tech wherein Devine provided Fast Tech with Apple's Confidential Information. In exchange, Fast Tech provided Devine with illicit payments, kickbacks, bribes, and other things of value. Devine split these illicit payments, kickbacks, bribes and other things of value with Andrew Ang, who served as a broker in transactions between Fast Tech and Devine, as well as between other suppliers and Devine. Ang became an employee of Fast Tech in or around February 2010.

77.     Apple was not a party to these covert side agreements between Devine and Fast Tech and Devine and Ang, and had no knowledge of their existence.

78.     Devine did not give to Apple and Apple did not receive the illicit payments made to Devine pursuant to these covert side agreements.

23

79.     E-mail correspondence between Devine, Ang and Fast Tech employees confirms that Devine, at various times from 2008 through the filing of this Complaint and pursuant to the agreement with Fast Tech alleged above, received illicit payments from Fast Tech in exchange for Devine providing Fast Tech with Apple's Confidential Information. Such conduct included, without limitation:

a.     On or about November 4, 2008, Devine and Ang exchanged e-mails regarding an agreement to assist Simon Song, who had secured future employment with Fast Tech, with a project to supply components for new Apple products. Devine agreed to provide Song with competitor price quotes and other confidential information regarding new Apple products. In exchange, Ang and Devine would enter into an agreement with Fast Tech "per promise [to Ang] from [Fast Tech] big boss."

b.     On or about February 11, 2009, Ang advised Fast Tech on its offer price to Apple based on Apple's Confidential Information provided by Devine.

c.     On April 9, 2009, Devine e-mailed Song a drawing of a USB power adaptor and the related pricing from a competitor of Fast Tech.

d.     On June 17, 2009, Devine e-mailed Song regarding Apple's intention to consolidate the suppliers for an Apple product power adapter. Devine later forwarded this e-mail to Ang, who appeared to disapprove of Devine's direct contact with Song: "you, me will discuss the cost as I will ask [Fast Tech] to quote first and then we decide. So in this way, we could control their pricing."

e.     On or about November 18, 2009, Devine instructed Marvin Chuow of Fast Tech how to conduct Fast Tech's negotiations with Apple concerning machinery investments. Devine advised Fast Tech via SMS text that Fast Tech should require a 50 machine investment from Apple and request information regarding 2010 volume.

80.     All of Apple's Confidential Information provided by Devine to Fast Tech in exchange for the illicit payments, kickbacks, and bribes described above was of a confidential, proprietary and secret nature and/or constituted Apple's trade secrets.

81.     Apple is informed and believes, and on that basis alleges, that Devine disclosed Apple's Confidential Information to Fast Tech with the intent that Fast Tech would use the information to construct offers to Apple to supply component materials for certain Apple products, to gain an unfair advantage in the contracting process, or to otherwise benefit Fast Tech's business interests, not Apple's. With Apple's Confidential Information, Fast Tech was

1   able to construct offers to Apple on terms more favorable to Fast Tech, and less favorable to

2   Apple. At all relevant times herein, Devine was expressly prohibited from disclosing Apple's

3   Confidential Information to Fast Tech for this purpose.

4   **Unidentified Targeted Supplier(s) Associated with Nelson Lee**

5         82.    Apple is informed and believes, and on that basis alleges, that Nelson Lee was an

6   employee of or associated with one or more unidentified Targeted Suppliers.

7         83.    Apple is informed and believes, and on that basis alleges, that Lee used personal

8   e-mail accounts to conceal the identities of the Apple suppliers with which he associated.

9         84.    Apple is informed and believes, and on that basis alleges, that from at least May

10   2007 to the filing of this Complaint, Devine entered into covert side agreements with

11   unidentified Targeted Suppliers wherein Devine provided unidentified Targeted Suppliers with

12   Apple's Confidential Information. In exchange, unidentified Targeted Suppliers provided

13   Devine with illicit payments, kickbacks, bribes, and other things of value.

14         85.    Apple is informed and believes, and on that basis alleges, that Lee acted as a

15   broker in the unlawful transactions between Devine and unidentified Targeted Suppliers.

16         86.    Apple was not a party to these covert side agreements between Devine and

17   unidentified Targeted Suppliers, and had no knowledge of their existence.

18         87.    Devine did not give to Apple and Apple did not receive the illicit payments made

19   to Devine pursuant to these covert side agreements.

20         88.    E-mail correspondence between Devine and Lee confirms that Devine disclosed

21   Apple's Confidential Information through Lee to unidentified Targeted Suppliers. Such conduct

22   included, without limitation:

23             a.    On May 13, 2007, Lee informed Devine that he had the "green light" to

24                 provide Lee "with a device drawing along with photos of the device" in
                     exchange for payment.

25             b.    On May 20, 2008, Lee requested that Devine provide him with "detail

26                 information. . . . from colors, launch dates and so on" because "[t]hey have
                     accepted and it is go go go." Lee also requested that he and Devine

27                 schedule a time to discuss payment information and said that if Devine
                     provided an address, "I will arrange some samples [*i.e.*, payments]."

28

c.   On May 20, 2008, Lee again e-mailed Devine and asked: "is it possible to provide me the phone 2 information?" On May 21, 2008, Devine replied that he "will provide the information regarding the phone if they want but not this year. We will need to agree on per product payment as well before I release the info."

d.   On June 25, 2008, Devine and Lee e-mailed regarding the drawings and dimensions of the yet-to-be-released iPhone. Devine asked Lee: "Do you still want the [iPhone] display drawings/dimensions?" Lee informed Devine that the purchaser became "too worry [sic] about advance information that might cause them trouble." But Lee was "still looking for other potential partners to take this deal." Lee told Devine that "[i]f you can provide dimension and diagram of new Iphone [sic] display, it will help me a lot."

e.   On July 22, 2009, Devine e-mailed Lee confidential CAD drawings for an unreleased iPod Touch model.

89.   Apple is informed and believes, and on that basis alleges, that all of Apple's Confidential Information provided by Devine to unidentified Targeted Suppliers through Lee in exchange for the illicit payments, kickbacks, and bribes described above was of a confidential, proprietary and secret nature and/or constituted Apple's trade secrets.

90.   Apple is informed and believes, and on that basis alleges, that Devine disclosed Apple's Confidential Information to unidentified Targeted Suppliers with the intent that unidentified Targeted Suppliers would use the information to construct offers to Apple to supply component materials for certain Apple products, to gain an unfair advantage in the contracting process, or to otherwise benefit their business interests, not Apple's. At all relevant times herein, Devine was expressly prohibited from disclosing Apple's Confidential Information for this purpose.

### APPLE'S POLICIES REGARDING EMPLOYEE CONDUCT

91.   Apple is informed and believes, and on that basis alleges, that Devine accepted illicit payments, kickbacks, bribes, and other things of value from the Targeted Suppliers in violation of Apple's policies. Under no circumstances would payments from the Targeted Suppliers to Devine be legitimate or proper under Apple's policies. By accepting illicit payments, kickbacks, bribes, and other things of value from the Targeted Suppliers, Devine's interests were made directly adverse to Apple's interests.

92.     Apple's Business Conduct Policy ("BCP") prohibits all Apple employees from receiving kickbacks, defined as "payments or items of value given to individuals in connection with the purchase or sale of products or services . . . ." The BCP also prohibits employees from entering into any business commitments outside of Apple's formal contracting process, through "side deals, 'side letters,' or otherwise." The BCP further prohibits employees from taking other employment without a manager's permission, and from using Apple's assets for outside business or their position at Apple to solicit work for an outside business or other employer. Apple's BCP also prohibits employees from disclosing any "confidential operational, financial, trade secret, or other business information without verifying with [their] manager that such disclosure is appropriate." The BCP is, and at all relevant times has been, accessible to employees via Apple's intranet. All employees are provided with a copy of the BCP during new-hire training and must comply with all requirements outlined in the BCP as a condition of employment. Employees are also given annual e-mail reminders of the BCP's terms along with a link to the policy's then-current wording, and are required to complete a bi-annual training course regarding the terms of the BCP.   Devine agreed to comply with all of Apple's company policies, including but not limited to the BCP. Devine received a copy of the BCP during his new-hire training and completed a bi-annual training course regarding the BCP on August 12, 2008 and on August 5, 2010.

93.     Through its Conflict of Interest—Outside Business Activities Policy ("Conflict of Interest Policy"), Apple prohibits employees from engaging in "any activity that is inconsistent with or opposed to Apple's best interests or that gives the appearance of such impropriety." Accordingly, the Conflict of Interest Policy forbids employees from taking on "any other employment, occupations, consulting or other business activities or commitments directly related to Apple's business or products or to its actual or demonstrably anticipated research or development." The Conflict of Interest Policy is, and at all relevant times has been, accessible to employees via Apple's intranet. All employees must comply with all requirements outlined in the Conflict of Interest Policy as a condition of employment. Devine agreed to comply with all of Apple's company policies, including but not limited to the Conflict of Interest Policy.

94.     Apple's Operations Code of Conduct Policy ("OCCP") establishes ethical standards of conduct that apply to all Apple employees working in Apple's Operations Department.  Because Operations personnel interact with suppliers and have access to Apple's and its suppliers' confidential information, these employees are held to higher standards than the general employee population at Apple.  The principle underlying the OCCP is that "Apple's interactions with its Suppliers must be 'beyond reproach.'"  Among other things, Apple's OCCP requires "all Apple Operations personnel to avoid any situation that creates a real or perceived conflict of interest," defined as "any activity that is inconsistent with or opposed to Apple's best interests, or that gives the appearance of impropriety or divided loyalty."  In accordance with these principles, "Operations personnel shall not give or receive **any** gifts from Apple suppliers, or anyone associated with suppliers, regardless of the value of the proposed gift."  Similarly, Operations personnel must "protect and maintain the confidentiality of [suppliers'] information."  The OCCP is, and at all relevant times has been, accessible to Operations employees via Apple's intranet.  All Operations employees must comply with all requirements outlined in the OCCP as a condition of employment.  Devine agreed to comply with all of Apple's company policies, including but not limited to the OCCP.  Devine received training on the OCCP most recently in July 2009.  In September 2009, all Operations employees were required to complete a Procurement Operations/Business Conduct Questionnaire requiring disclosure of any knowledge of business conduct policy violations.  Devine submitted his completed questionnaire on September 4, 2009, in which he declared that he was unaware of any violations of the OCCP or the BCP.

95.     Apple has implemented a policy regarding Confidential, Proprietary and Trade Secret Information (the "Confidential Information Policy").  Apple's Confidential Information Policy requires all Apple employees to "[p]rotect Apple's confidential, proprietary and trade secret information and that of third parties."  Among other things, the Confidential Information Policy also provides: (a) that "[n]o Apple employee may disclose Apple confidential information to an outside party unless a written agreement or license has been previously signed and approved by the division vice president," (b) that "Apple respects the confidential

28

1 information of others" and that "[n]o Apple employee may use or disclose any such third-party

2 information unless that employee is authorized by the third party to do so and until the employee

3 has signed a confidentiality agreement with Apple," and (c) that "Apple's non-disclosure

4 agreements cover both disclosure of Apple information to another party and disclosure of the

5 other party's information to Apple." Apple's Confidential Information (as defined in this

6 Complaint) includes, but is not limited to, the information covered by Apple's Confidential

7 Information Policy. The Confidential Information Policy also expressly informs employees that

8 Apple's confidential, proprietary and trade secret information constitutes Apple's "competitive

9 advantage in the marketplace" and that a violation of the "policy is grounds for disciplinary

10 action, up to and including termination of employment," and "[c]ivil and/or criminal penalties."

11 The Confidential Information Policy is, and at all relevant times has been, accessible to

12 employees via Apple's intranet. All employees must comply with all requirements outlined in

13 the Confidential Information Policy as a condition of employment. Devine agreed to comply

14 with all of Apple's company policies, including but not limited to the Confidential Information

15 Policy.

16  96. When hired, all Apple employees are required to agree to and sign an Intellectual

17 Property Agreement that requires employees to protect Apple's "Proprietary Information." That

18 agreement informs employees that "Proprietary Information" includes "any information of a

19 confidential, proprietary and secret nature that may be disclosed to you or otherwise learned by

20 you in the course of your employment at Apple, including but not limited to any confidential

21 information of third parties." As examples of Proprietary Information, the agreement

22 specifically includes "information and material relating to past, present or future inventions,

23 marketing plans, manufacturing and product plans, technical specifications, hardware designs

24 and prototypes, business strategies, financial information, and forecasts." The agreement

25 prohibits an employee from disclosing such information to anyone outside of Apple at any time.

26 Among other things, the agreement provides: "You understand and agree that your employment

27 by Apple requires you to keep all Proprietary Information in confidence and trust for the tenure

28 of your employment and thereafter, and that you will not use or disclose Proprietary Information

1  without the written consent of Apple . . . ."  Apple's Confidential Information (as defined in this

2  Complaint) includes, but is not limited to, the Proprietary Information covered by this

3  agreement.  The agreement also provides: "You agree that during the tenure of your

4  employment by Apple you will not plan or engage in any other employment, occupations,

5  consulting or other business activities or commitments directly related to Apple's business or

6  products, or to its actual or demonstrably anticipated research or development, nor will you

7  engage in any other activities that conflict with your employment obligations to Apple."  Devine

8  signed a copy of the Intellectual Property Agreement on May 20, 2005.

9        97.  At all times relevant to this Complaint, Apple has informed employees through

10  its intranet that, as an Apple employee, they are responsible for understanding and abiding by all

11  Apple policies and for keeping informed of the additions and changes to the policies.  Apple

12  employees are informed that a "[v]iolation of an Apple policy could result in disciplinary

13  actions, up to and including termination."

14  **APPLE'S REASONABLE EFFORTS TO PROTECT ITS**

15  **CONFIDENTIAL INFORMATION**

16        98.  Apple's Confidential Information is not commonly known to the public or to

17  other persons who can obtain economic value from its disclosure or use.  The secrecy of Apple's

18  Confidential Information provides Apple a substantial business advantage.  Consequently, Apple

19  maintains that some, if not all, of Apple's Confidential Information is a trade secret.

20        99.  Apple takes all reasonable steps under the circumstances to maintain the

21  confidentiality of Apple's Confidential Information.  Apple secures all of its computer networks

22  behind a firewall.  Persons outside of Apple cannot obtain access to Apple's computers without

23  Apple's authorization.  Apple also limits access to Apple's Confidential Information to

24  individuals under non-disclosure obligations who have a need to know.

25        100.  Apple's facilities are secured.  All doors leading into the main facility are locked

26  at all times.  To gain access to Apple's facilities, persons must have keycards issued by Apple

27  that include their photographs.  Only Apple employees, temporary employees and eligible

28  vendors, associates, and contractors receive keycards.  Any person lacking a keycard must be

30

1     escorted by an Apple employee while within Apple's facilities.

2        101.    At all relevant times herein, Apple's relationships with its suppliers and their

3     representatives were governed by Confidentiality Agreements, which generally prohibit the

4     unauthorized disclosure of confidential information shared among Apple and its suppliers. The

5     confidential information covered by these Confidentiality Agreements specifically includes

6     nonpublic information received from the other party regarding product costs and/or prices.

7     These Confidentiality Agreements expressly prohibit Apple and its suppliers from using

8     confidential information received from the other for any other purpose than that for which the

9     information was disclosed, and from using confidential information received from the other for

10     their own or any third party's benefit without prior written consent.

11 **APPLE'S CAUSES OF ACTION**

12 **FIRST CAUSE OF ACTION**

13 **(18 U.S.C. § 1962(c) Against Defendant Devine)**

14        102.    Apple realleges each and every allegation set forth in Paragraphs 1 through 101,

15     inclusive, and incorporates them by reference herein.

16        103.    Devine's unlawful, tortious and otherwise actionable conduct constitutes violation

17     of 18 U.S.C. § 1962(c).

18        104.    From October 2006 through the filing of this Complaint, Devine engaged in

19     activities with the following companies: Cresyn, Kaedar, Jin Li Mould, Glocom, Nishoku, and

20     Fast Tech. At all times relevant herein, each company constituted a RICO enterprise and was

21     engaged in, and its activities affected, interstate and foreign commerce. Each enterprise

22     functioned individually and as continuing units operating the fraudulent scheme to defraud Apple

23     as alleged above from approximately October 2006 through the filing of this Complaint. Devine,

24     for the purpose of executing the scheme to defraud Apple, by means of tortious, fraudulent and

25     criminal conduct, did unlawfully, willfully and knowingly conduct and participate, directly and

26     indirectly, in the affairs of Cresyn, Kaedar, Jin Li Mould, Glocom, Nishoku, and Fast Tech

27     through racketeering activity.

28        105.    Devine committed multiple violations of the predicate acts of wire fraud, 18

31

1    U.S.C. § 1343, of the Travel Act, 18 U.S.C. § 1952, and of commercial bribery in violation of

2    Cal. Penal Code § 641.3, through his scheme.  The pattern of racketeering constitutes both a

3    history of criminal conduct and a distinct threat of continuing criminal activity.

4         106.    As described in Paragraphs 18 through 90, inclusive, a scheme to defraud Apple

5    existed whereby Devine accepted and received illicit payments, kickbacks, bribes, and other

6    things of value from the Targeted Suppliers in exchange for Apple's Confidential Information.

7    Devine concealed these facts from Apple when he had a duty to disclose such facts.  The scheme

8    defrauded Apple by means of false or fraudulent pretenses, representations or promises, within

9    the meaning of 18 U.S.C. § 1343.  Devine participated in this scheme with the specific intent to

10   defraud Apple.

11        107.    Apple is informed and believes, and on that basis alleges, that interstate and

12   international wire communications were used in the scheme to defraud Apple.  Each such use of

13   interstate and international wire communications constituted a predicate act of wire fraud in

14   violation of 18 U.S.C. § 1962(c).  Devine received payments, kickbacks, bribes or other things of

15   value via wire and structured such payoffs so as to avoid detection of his scheme:

16        a.    On February 8, 2007, Devine e-mailed Yang of Cresyn: "I prefer to do the
               transaction in Travelers Checks or by cash, without involving any banks.
17             Can you see if that is possible?  I know it's a bit more work but working
               with Travelers checks have been very effective in my past experience."
18

19        b.    On October 5, 2007, Devine e-mailed Yang of Cresyn: "I still haven't
               received Sept payment.  Can you check with your Accounting Dept?
20             Please do not send the Sept and Oct payment together in one wire transfer.
               Anything over $10,000 wired could draw too much attention."
21

22        c.    On April 30, 2009, Devine e-mailed Chan of Glocom: "Below, please find
               the bank information for Korea.  If you can make the transfers below $10K
23             (like $9K) would be good to avoid some attention."

24        d.    On September 16, 2009, Betty Wu and Devine e-mailed regarding the
               structuring of wire transfers in amounts under $10,000.
25

26        e.    As set forth above in Paragraphs 35, 46, 55, 64, 72, 79, and 88, Devine
               used the interstate wires numerous times in furtherance of his scheme.

27        108.    Devine and his accomplices used interstate and international wire communications

28   over the Internet in furtherance of the scheme to defraud Apple.  Devine avoided using his Apple

32

1   e-mail address as part of his scheme so as to avoid detection.  Instead, he created and used

2   separate Hotmail and Gmail e-mail accounts to carry out and conceal his fraudulent scheme.  On

3   September 16, 2008, Devine e-mailed Yang of Cresyn from his Hotmail e-mail account:  "I

4   received your email on my Apple email account.  Please avoid using that email as Apple IT team

5   will randomly scan emails for suspicious email communications for forecast, cost and new model

6   information."

7        109.   Devine violated the Travel Act, 18 U.S.C. § 1952, multiple times by traveling in

8   interstate and international commerce and using facilities in interstate commerce, with the intent

9   and effect of promoting, managing, establishing, carrying on, or facilitating the promotion,

10  management, establishment or carrying on of the commercial bribery scheme, in violation of

11  California Penal Code § 641.3.  For example, on January 22, 2008, Ang and Devine e-mailed

12  regarding scheduling a meeting in Macau:  "Have check [sic] with my boss that we probably have

13  to meet in macau for the samples [*i.e.*, payments]."  On October 14, 2008, Ang stated in an e-mail

14  that Devine would "be in macau for the collection" and that Ang would "collect from him

15  [unknown individual] whatever amount he prepare [sic] and will pass to you on our next

16  meeting."

17       110.   Devine violated California Penal Code § 641.3 multiple times by accepting or

18  agreeing to accept money or other things of value from the Targeted Suppliers, in exchange for

19  Devine using or agreeing to use his position as an employee of Apple for the benefit of the

20  Targeted Suppliers.  Devine did so with the specific intent to injure or defraud Apple.  This

21  occurred without the knowledge or consent of Apple.

22       111.   Each violation of 18 U.S.C. § 1343, 18 U.S.C. § 1952, and Cal. Penal Code §

23  641.3 constitutes a separate instance of "racketeering activity" as defined in 18 U.S.C. § 1961(1)

24  and was committed in furtherance of Devine's scheme to defraud Apple.  These violations

25  constitute a pattern of racketeering activity in that they have the same or similar purposes, results,

26  participants, victims and/or methods of commission, as set forth above in Paragraphs 18 through

27  90, inclusive.  The pattern of racketeering activities affected interstate and foreign commerce.

28       112.   Apple has been injured in its business and/or property as a direct and proximate

1    result of Devine's violation of 18 U.S.C. § 1962(c), including injury by reason of the predicate

2    acts constituting the pattern of racketeering activity.

3        113.    As a result of the violation of 18 U.S.C. § 1962(c), Apple has suffered substantial

4    damages, in an amount to be proven at trial. Pursuant to 18 U.S.C. § 1964(c), Apple is entitled to

5    recover treble its general and special compensatory damages, plus interest, costs and attorneys'

6    fees, incurred by reason of Devine's violation of 18 U.S.C. § 1962(c). Devine's actions were

7    undertaken with fraud, malice or oppression, or with a conscious disregard of Apple's rights.

8    Therefore, Apple is entitled to an award of exemplary and punitive damages against Devine, in an

9    amount according to proof at trial.

## SECOND CAUSE OF ACTION

### (15 U.S.C. § 13(c) Against Defendant Devine)

12       114.    Apple realleges each and every allegation set forth in Paragraphs 1 through 113,

13   inclusive, and incorporates them by reference herein.

14       115.    Devine, in violation of his fiduciary and contractual duties to Apple as its agent

15   and employee, received compensation in the form of illicit payments, bribes, kickbacks,

16   commissions and other things of value from the Targeted Suppliers. The payments accepted by

17   Devine from the Targeted Suppliers were illegal kickbacks and/or bribes, in violation of 15

18   U.S.C. § 13(c).

19       116.    These payments were not for bona fide services rendered by Devine in

20   connection with the sale or purchase of goods but were in the nature of commercial bribes or

21   kickbacks to Devine, which directly undermined the fiduciary duties Devine owed to Apple.

22       117.    From October 2006 through the filing of this Complaint, the Targeted Suppliers

23   paid to Devine and Devine accepted, without the knowledge and consent of Apple, illicit

24   payments, kickbacks, bribes and other things of value. In return, Devine used or agreed to use

25   his position as an employee of Apple for the benefit of those persons and entities. Knowing that

26   he would receive illicit payments, kickbacks, bribes, and other things of value, Devine

27   influenced Apple's buying, contracting and allocation decisions in transactions between Apple

28   and the Targeted Suppliers for sales of goods.

118. The unlawful payments to Devine from the Targeted Suppliers corruptly influenced transactions between Apple and the Targeted Suppliers for sales of goods that were in the flow of interstate commerce.

119. The unlawful payments between Devine, who resides in California, and the Targeted Suppliers, who reside in countries in Asia, occurred in the course of commerce among the several states and/or with foreign nations.

120. As a result of the illegal payments made to Devine, Apple suffered injury in the form of monetary losses. This scheme precluded the realization of Apple's maximum profit potential. As a result of Devine's fraudulent scheme to obtain illicit payments, kickbacks, bribes, and other things of value from the Targeted Suppliers in exchange for Apple's Confidential Information, Apple acquired goods at a higher price than it would have paid without Devine's unlawful and fraudulent conduct.

121. As a result of the violations of 15 U.S.C. § 13(c), Apple has suffered substantial damages, in an amount to be proven at trial. Pursuant to 15 U.S.C. § 15(a), Apple is entitled to recover treble its compensatory damages, plus interest, costs and attorneys' fees, incurred by reason of Devine's violations of 15 U.S.C. § 13(c). Devine's actions were undertaken with fraud, malice or oppression, or with a conscious disregard of the rights of Apple and, therefore, Apple is entitled to an award of exemplary and punitive damages against Devine, in an amount according to proof at trial.

### THIRD CAUSE OF ACTION

### (Fraud Against Defendant Devine)

122. Apple realleges each and every allegation set forth in Paragraphs 1 through 121, inclusive, and incorporates them by reference herein.

123. Devine misrepresented and concealed material facts regarding the scheme he designed and executed to demand and receive illicit payments, kickbacks, bribes and other things of value from the Targeted Suppliers and, in exchange, to provide the Targeted Suppliers with Apple's Confidential Information. This conduct began in or around October 2006 and continued until the filing of this Complaint.

35

124.    Pursuant to agreements entered into with Apple and the fiduciary duty owed to Apple as its employee, Devine had a duty to disclose these material facts to Apple.  The OCCP required Devine to report "any conduct that is in violation of Apple's Business Conduct Policy, or legal or regulatory requirements," including "real or apparent conflicts of interest, actions that may compromise relationships or confidential and proprietary information, lack of impartiality between suppliers, reciprocity and self-dealing."  Devine failed to discharge his duty by fraudulently concealing his illegal scheme as described herein.

125.    Devine also made false representations to Apple regarding his non-compliance with Apple's OCCP and BCP, described above, in an effort to conceal his fraudulent scheme from Apple.

126.    On or around September 4, 2009, Devine submitted a written statement to Apple that he was unaware of any Procurement Operations or Business Conduct violations.  This representation made by Devine was false.  The true fact was that Devine had committed numerous material violations of the OCCP and BCP.

127.    Also, Devine made false representations to Apple in order to obtain Apple's Confidential Information for the purpose of providing it to the Targeted Suppliers.

128.    On August 27, 2009, Devine e-mailed Apple employee Lane Kato and requested cost information for various suppliers, including a Cresyn competitor, purportedly for purposes of an accuracy review with Devine's supervisor.  This representation made by Devine was false because there was no such review with Devine's supervisor.  The true fact was that Devine sought this information in furtherance of his illegal scheme.  On September 24, 2009, Devine e-mailed to Andy Yang of Cresyn the confidential cost information provided by Kato.

129.    When Devine made these misrepresentations, he knew them to be false.  Devine made these misrepresentations with the intent to deceive and defraud Apple and to induce Apple to act in reliance on his representation.

130.    In reliance on Devine's representations and in ignorance of the material facts he concealed, Apple entered into supply agreements—on terms less favorable as they would have been otherwise—with the Targeted Suppliers for component materials for certain Apple

36

products at various times from at least October 2006 through the filing of this Complaint.

131.   In reliance on Devine's representations and in ignorance of the material facts he concealed, Apple entrusted Devine with Apple's Confidential Information and continued to employ Devine.

132.   As a proximate result of the fraudulent conduct of Devine, Apple has been injured in its business or property.

133.   As a proximate result thereof, Apple has been damaged in an amount to be proven at trial.

134.   Devine's actions were undertaken with fraud, malice or oppression, or with a conscious disregard of the rights of Apple and, therefore, Apple is entitled to an award of exemplary and punitive damages against Devine, in an amount according to proof of trial.

### FOURTH CAUSE OF ACTION

### (Breach of Contract Against Defendant Devine)

135.   Apple realleges each and every allegation set forth in Paragraphs 1 through 134, inclusive, and incorporates them by reference herein.

136.   At all relevant times, Devine agreed to abide by and comply with all Apple policies governing his employment, and his employment was conditioned upon his agreement. These policies included Apple's Confidential Information Policy, the Conflict of Interest Policy, the OCCP and the BCP.  At all relevant times, the foregoing policies, and Devine's agreement to abide by them, were valid and in effect.

137.   Apple has performed all of its duties owed to Devine.

138.   Through Devine's scheme set forth above, Devine materially breached Apple's policies that Devine agreed to abide by.  In breach of his contractual obligations, Devine made unauthorized use and disclosure of Apple's Confidential Information, technical data, trade secrets, or know-how; conducted activity that is inconsistent with and opposed to Apple's best interests; received illicit payments, kickbacks, bribes and other things of value in connection with the unauthorized disclosure of Apple's Confidential Information; and created real and perceived conflicts of interest.

139.   Apple is entitled to recover from Devine the damages sustained as a result of these breaches of Apple's policies governing his employment. The amount of damages cannot be determined at this time but will be proven at trial. Apple is further entitled to recover from Devine the gains, profits and advantages that Devine obtained as a result of these breaches. Apple is currently unable to ascertain the full extent of these gains, profits, and advantages, but will prove the value thereof at trial.

## FIFTH CAUSE OF ACTION

### (Breach of Fiduciary Duty Against Defendant Devine)

140.   Apple realleges each and every allegation set forth in Paragraphs 1 through 139, inclusive, and incorporates them by reference herein.

141.   Devine, as an employee of Apple, owed Apple a duty of loyalty to act solely for Apple's benefit in all matters connected with his employment, including in any dealings he might have with Apple's suppliers and other third parties.

142.   Pursuant to the duty of loyalty owed to Apple, Devine had a duty to disclose to Apple the personal and financial arrangements that Devine had with the Targeted Suppliers or other third parties and to refrain from activities and transactions that were in conflict with or adverse to Apple's best interests.

143.   Pursuant to the duty of loyalty owed to Apple, Devine had a duty to disclose, account for and remit to Apple any profit, compensation, consideration or benefit that Devine received in connection with the transaction of Apple's business, beyond his salary from Apple.

144.   By his conduct as set forth above in demanding, accepting and receiving illicit payments, kickbacks, bribes and other things of value from the Targeted Suppliers, without ever disclosing the same to Apple, Devine has breached his obligations to Apple; has acted adversely to the best interests of Apple; has obtained secret and undisclosed profits, compensation, consideration and benefit during the transaction of Apple's business; and has never accounted for the same to Apple, all to Apple's loss and damage.

145.   As a direct and proximate result of the unlawful acts of Devine, Apple has sustained and will continue to sustain damages. The amount of damages cannot be determined

1    at this time but will be proven at trial.

2        146.    During the period in which he was engaged in the fraudulent scheme described

3    above and accepting illegal kickbacks, thus breaching his fiduciary duty to Apple, Devine was

4    not entitled to receive any compensation paid to him by Apple, and Apple is entitled to recover

5    from Devine the entire amount of compensation paid to him during this period.

6                                    **SIXTH CAUSE OF ACTION**

7                    **(Misappropriation of Trade Secrets Against Defendant Devine)**

8        147.    Apple realleges each and every allegation set forth in Paragraphs 1 through 146,

9    inclusive, and incorporates them by reference herein.

10       148.    Apple's Confidential Information includes "trade secrets" under California Civil

11   Code § 3426.1 because it (1) is not generally known to the public or to other persons who can

12   obtain economic value from its disclosure or use, (2) derives independent economic value from

13   not being generally known, and (3) is subject to reasonable efforts by Apple to maintain its

14   secrecy.

15       149.    Devine misappropriated Apple's Confidential Information by:

16       a.    Acquiring those trade secrets by improper means, including theft, bribery,
             misrepresentation, and/or breach or inducement of a breach of a duty to
17           maintain secrecy (hereinafter, "Improper Means");

18       b.    Acquiring those trade secrets by Improper Means and disclosing them to
19           the public without Apple's express or implied consent;

20       c.    Disclosing those trade secrets to the public without Apple's express or
             implied consent and with knowledge or reason to know that the trade
21           secrets were derived from or through a person who had acquired them by
             Improper Means;

22

23       d.    Disclosing those trade secrets to the public without Apple's express or
             implied consent and with the knowledge or reason to know that the trade
24           secrets were acquired under circumstances giving rise to a duty to maintain
             the secrecy or limit the use of those trade secrets;

25

26       e.    Disclosing those trade secrets to the public without Apple's express or
             implied consent and with the knowledge or reason to know that the trade
             secrets were derived from or through a person who had a duty to Apple to
27           maintain the secrecy or limit the use of the trade secrets; and/or

28       f.    Disclosing those trade secrets to the public without Apple's express or

                                               39

implied consent, without a material change in Devine's position, and with the knowledge or reason to know that Apple's Confidential Information was a trade secret and that knowledge of it had been acquired by mistake or accident.

150.   Apple is entitled to recover from Devine the damages sustained as a result of the misappropriation described herein.  The amount of such damages cannot be determined at this time but will be proven at trial.  Apple is further entitled to recover from Devine the gains, profits, and advantages that Devine obtained as a result of the misappropriation alleged herein. Apple is currently unable to ascertain the full extent of these gains, profits, and advantages, but will prove the value thereof at trial.

151.   Apple is informed and believes, and on that basis alleges, that Devine's acts of misappropriation were both willful and malicious, entitling Apple to exemplary damages.

### SEVENTH CAUSE OF ACTION

### (Common Law Misappropriation Against Defendant Devine)

152.   Apple realleges each and every allegation set forth in Paragraphs 1 through 151, inclusive, and incorporates them by reference herein.

153.   Apple owns the confidential and proprietary information and other non-trade secret property at issue in this Complaint.  Apple invested substantial time and money in developing its confidential and proprietary information and property.  Devine has appropriated Apple's confidential and proprietary information and other non-trade secret property at little or no cost to him.

154.   Devine appropriated Apple's confidential and proprietary information and other non-trade secret property at issue in this Complaint without Apple's authorization and consent.

155.   By reason of the above-alleged acts and conduct of Devine, Apple has and will continue to suffer great harm and damage.

156.   Apple is entitled to recover from Devine the actual damages sustained by Apple as a result of Devine's wrongful acts described in this Complaint.  The amount of damages cannot be determined at this time but will be proven at trial.  Apple is further entitled to recover from Devine the gains, profits, advantages, and unjust enrichment that he has obtained as a

result of his wrongful acts described herein. Apple is currently unable to ascertain the full extent of these gains, profits, and advantages, but will prove the value thereof at trial.

## EIGHTH CAUSE OF ACTION

### (Restitution and Unjust Enrichment Against All Defendants)

157. Apple realleges each and every allegation set forth in Paragraphs 1 through 156, inclusive, and incorporates them by reference herein.

158. Defendants received a benefit from Apple, in the form of monetary payments that were associated with the operation of the scheme alleged above, and in the form of monetary payments that were paid as compensation for Devine's employment.

159. In light of Defendants' conduct, it would be unjust for Defendants to retain the benefits they obtained from operating the scheme alleged above or for Devine to retain the compensation paid by Apple to Devine as compensation for his employment.

160. Defendants have been unjustly enriched by Apple's payments and should be required in equity to make restitution of these payments to Apple.

## NINTH CAUSE OF ACTION

### (Conversion Against Defendant Devine)

161. Apple realleges each and every allegation set forth in Paragraphs 1 through 160, inclusive, and incorporates them by reference herein.

162. At all times relevant herein, Apple owned the confidential and proprietary information and other non-trade secret property at issue in this Complaint that Devine has taken from Apple and converted to his own personal use.

163. Apple is informed and believes, and on that basis alleges, that Devine presently maintains a copy or copies of Apple's Confidential Information in his immediate possession or control and that he has transferred Apple's Confidential Information to other individuals.

164. Apple owned exclusively Apple's Confidential Information and all copies thereof.

165. Devine's actions, as alleged, threaten to irreparably and immediately harm Apple.

166. Devine's actions, as alleged, have harmed Apple in an amount to be proven at

trial.

## TENTH CAUSE OF ACTION

### (Unfair Competition (Cal. Bus. & Prof. Code §§ 17200 *et seq.*) Against All Defendants)

167. Apple realleges each and every allegation set forth in Paragraphs 1 through 166, inclusive, and incorporates them by reference herein.

168. Defendants engaged in unlawful, unfair and/or fraudulent business practices. Defendants' actions violate California Business and Professions Code § 17200 *et seq.*

169. As discussed herein, Defendants' scheme was unlawful under state and federal laws, including but not limited to RICO, 18 U.S.C. § 1962(c), and the Robinson-Patman Act, 15 U.S.C. § 15(c), and constituted common law fraud and trade secret theft.

170. Defendants' conduct was also fraudulent and deceptive, and was unfair to Apple, in that it offended established public policy, and/or was immoral, unethical, oppressive, unscrupulous and substantially injurious to Apple.

171. As a direct result of Defendants' conduct, Apple has suffered an injury in fact and has lost money and/or property that have been wrongfully retained by Defendants.

172. Apple is entitled to recover from Defendants the gains, profits, advantages, and unjust enrichment that they have obtained as a result of the acts of unfair competition described herein.

## ELEVENTH CAUSE OF ACTION

### (Money Had and Received Against Defendant Devine)

173. Apple realleges each and every allegation set forth in Paragraphs 1 through 172, inclusive, and incorporates them by reference herein.

174. At all times during which Devine was employed by Apple, Apple paid Devine the compensation provided for by Devine's employment arrangement.

175. Devine failed to perform services pursuant to his employment arrangement by failing to act loyally for Apple's benefit in all matters connected with this arrangement.

176. In such circumstances, where compensation is received by an employee only because he or she fraudulently conceals his or her disloyalty from the employer, California law

42

recognizes that the employee forfeits the right to the compensation in question, and the employer may recover the sums paid.

177.     Accordingly, Apple is entitled to recover from Devine the full compensation Apple paid to him during the employment arrangement.  Apple paid Devine at least $665,000, over the course of approximately five years, as well as other compensation according to proof at trial.

178.     Wherefore Apple demands damages in the amount of $665,000, in addition to the value of all other compensation as proven at trial, plus interest and cost.

## TWELFTH CAUSE OF ACTION

### (For An Accounting Against All Defendants)

179.     Apple realleges each and every allegation set forth in Paragraphs 1 through 178, inclusive, and incorporates them by reference herein.

180.     At all relevant times herein, Devine, as a fiduciary to Apple, owed Apple the duties of good faith, care, candor and loyalty.

181.     Apple seeks a complete accounting of all illicit payments, kickbacks, bribes and other things of value received directly or indirectly by Devine, his employees, agents, representatives, consultants, any fictitious businesses operated by Devine, or any pseudonyms used by Devine from the time he became an Apple employee in 2005 to the present.  An accounting is necessary to determine the amount of money Devine received in exchange for his unlawful disclosure of Apple's Confidential Information and other unlawful actions described herein.

182.     Apple seeks a complete accounting of all illicit payments, kickbacks, bribes and other things of value made, disbursed, or paid out as a result of Devine's illegal scheme from the time he became an Apple employee in 2005.  An accounting is necessary to determine the amount of money Devine received in exchange for his unlawful disclosure of Apple's Confidential Information and other unlawful actions described herein.

183.     Apple seeks a complete accounting of all payments made to Devine or Defendant CPK Engineering, including any deposits or wire transfers made to any bank accounts

maintained or opened by Devine, in his name or any other name, and/or opened or maintained

by or on behalf of CPK Engineering, or other entities owned or controlled by Devine.  An

accounting is necessary to determine the amount of money CPK Engineering and Devine

received in exchange for Devine's unlawful disclosure of Apple Confidential Information and

other unlawful actions described herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Apple Inc. prays for judgment against Defendants as follows:

1.     Judgment in favor of Apple and against Defendants on all causes of action;

2.     For compensatory damages in an amount to be determined at trial;

3.     For exemplary and punitive damages in an amount to be determined at trial;

4.     For treble damages against Defendant Devine pursuant to 18 U.S.C. Section 1964 according to proof at trial;

5.     For treble damages against Defendant Devine pursuant to 15 U.S.C. Section 13(c) according to proof at trial;

6.     Disgorgement of ill-gotten gains;

7.     For a preliminary injunction restraining the misappropriation of Apple's Confidential Information;

8.     For an injunction permanently restraining the misappropriation of Apple's Confidential Information;

9.     For an accounting of the profits Defendants have gained as a result of Devine's wrongful conduct;

10.     For interest;

11.     For costs of suit and attorneys' fees incurred herein;

12.     For exemplary and punitive damages; and

13.     For such other relief as the Court deems just and proper.

44

Dated:  August 12, 2010

GEORGE A. RILEY
SHARON M. BUNZEL
AARON M. ROFKAHR
JEAN B. NIEHAUS
O'MELVENY & MYERS LLP


By: _____
        Sharon M. Bunzel
Attorneys for Plaintiff
Apple Inc.

45

COMPLAINT

Apple respectfully requests a jury trial on all issues triable thereby.

Dated: August 12, 2010

GEORGE A. RILEY
SHARON M. BUNZEL
AARON M. ROFKAHR
JEAN B. NIEHAUS
O'MELVENY & MYERS LLP


By: _____
    Sharon M. Bunzel
Attorneys for Plaintiff
Apple Inc.